## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kevin L. Johnson,                                  **Civil File No.: 10-856 MJD/SER**

             Plaintiff,

v.                                                 **REPORT AND RECOMMENDATION**

Michael J. Astrue,

             Defendant.

Edward C. Olson, Esq., 331 2nd Ave South, Suite 240, Minneapolis, Minnesota 55401, on behalf of Plaintiff.

Lonnie F. Bryan, Esq., Office of the United States Attorney, 300 South 4th Street, Suite 600, Minneapolis, Minnesota 55415, on behalf of Defendant.

STEVEN E. RAU, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff Kevin L. Johnson ("Johnson") seeks judicial review of the decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), who denied Johnson's application for supplemental security income. This matter has been referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. The parties filed cross-motions for summary judgment. For the reasons set forth below, this Court recommends that Johnson's motion be denied and that the Commissioner's motion be granted.

### I.      BACKGROUND

#### A.  Procedural History

Johnson filed an application for social security disability insurance (SSDI) and supplemental security income (SSI) on September 20, 2008, alleging a disability beginning

September 11, 2007, due to Horner's Syndrome, cluster headaches, and shoulder injuries. (Admin. R. at 10, 164).   Johnson asserts that these impairments prevented him from concentrating, remembering things, and, in the case of cluster headaches, requires him to frequently and unpredictably lie down and take oxygen.  *Id.* at 165.   He alleges that these disabilities caused him to stop working as a taxi cab driver.  *Id.*

Initially, Johnson's application was denied on October 30, 2008 and was denied for reconsideration on January 7, 2009.  *Id.* at 83.   Johnson requested a timely hearing, which was held on June 16, 2009, before Administrative Law Judge Roger W. Thomas ("the ALJ").   The ALJ issued an unfavorable decision on July 17, 2009.  *Id.* at 10-17.   On August 4, 2009, Johnson sought the Appeals Council's review of that decision, but the Appeals Council denied Johnson's request for review.  *Id.* at 66-67, 270-72.   The ALJ's decision therefore became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan,* 958 F.2d 817, 822 (8th Cir. 1992).   Johnson now seeks judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## B.  Plaintiff's Testimony

Johnson was 47 years old when he filed his SSI application.  (Admin. R. at 22).   He completed one year of college.  *Id.* at 26.   On February 28, 2007, Johnson was in a car accident while working as a cab driver, which injured both of his rotator cuffs.  *Id.* at 29.   Because he was considered a self-employed independent contractor, Johnson did not file a workers' compensation claim after the accident.  *Id.* at 30, 45-46.   After the car accident, Johnson took Cortisone injections in his left shoulder.  *Id.* at 29-30.   He continued working full-time as a cab driver until July 2007, when he stopped working as a result of his shoulder injuries.  *Id.* at 29.

During a September 11, 2007, surgery on his left rotator cuff, the anesthesiologist damaged a nerve, which caused Johnson's Horner's Syndrome precipitated by a sympathetic

nerve injury.  *Id.* at 30-31.  Horner's Syndrome causes Johnson's left eye to droop, prevents him from sweating on the left side of his face, and causes cluster headaches.  *Id.* at 31.  Currently, his eye does not droop as much now as it did after surgery, but the lack of sweating has not changed since the surgery.  *Id.* at 31-33.  He notices his drooping eye every time he looks in the mirror. *Id.* at 32.

Prior to his September 11, 2007 shoulder surgery, Johnson did not suffer from headaches. *Id.* at 43.  Loud noises, sirens, yelling, perfume, and children screaming all trigger his headaches, which bright lights also exacerbate.  *Id.* at 43-44.  Johnson kept a diary starting in January 2009 chronicling his headaches.  *Id.* at 44-45.  He rated his headache pain as a ten on a scale of one to ten with ten being the worst pain imaginable.  *Id.* at 45.

When Johnson gets a headache, he must lie down, which causes him to remain lying down for approximately 75 percent of the day.  *Id.* at 47.  He is unable to do any household tasks or chores when he is experiencing a cluster headache.  *Id.*  Johnson likens his headache pain to having a leg amputated without anesthesia.  *Id.* at 49.  He describes his headaches as permanent and chronic.  *Id.* at 50.

Johnson has been treated for his headaches and Horner's Syndrome with physical therapy and medications including Lithium, Carbatrol, Gabapentin, and Naproxen.  *Id.* at 36-41.  Johnson asserted that Lithium did not help his headaches.  *Id*. at 40.  He suffered side effects from taking Carbatrol as a medication for his cluster headaches including hallucinations, depression, anxiety, loss of appetite, sweats, chills, and difficulty forming sentences and concentrating.  *Id.* at 39. Johnson has also taken Gabapentin for his headaches, which he was taking as of the date of the hearing in June 2009.  *Id.* at 40.  His side effects from Gabapentin include anxiety, memory loss, and difficulty sleeping and concentrating.  *Id.*  Johnson asserted that though he was on

Gabapentin, he continued to have severe headaches up to fifteen times per day.  *Id.* at 41.

Johnson was taking the anti-inflammatory Naproxen at the time he filled out his SSI application,

but he was not taking it as of the date of the hearing.  *Id.*  He had oxygen with him at the time of

the hearing, which his primary care physician, Dr. Keith Mastin, prescribed in January 2008 for

use after a severe headache.  *Id.*  The oxygen helps him regain his strength.  *Id.* at 41-42.

Johnson testified at the administrative hearing that he is married and his wife lives in

Hong Kong.  *Id.* at 28-29.  He has two children that he sees approximately once per year.  *Id.* at

25.  Johnson can bathe and dress himself, but his mother and sister help him with cooking and

cleaning.  *Id.* at 28.  He lives alone.  *Id.* at 28-29.  He has a driver's license but has not driven for

several years due to blackouts.  *Id.* at 26.  As a result of his headaches, he is no longer able to

engage in the activities that he enjoyed such as playing golf, playing cards, or hunting and

fishing.  *Id.* at 47-48.  He is still, however, able to watch television and garden.  *Id.*

He testified that he decreased his smoking and alcohol consumption to one cigarette per

day and one drink per day after an incident on February 20, 2008 when he suffered an enlarged

colon and high blood pressure.  *Id.* at 26-27, 34-35.  Johnson uses a cane for balance problems

due to a back condition, but he does not need the cane for walking.  *Id.* at 27.

Johnson testified that even with medication, he suffers from cluster headaches up to

fifteen times per day.  *Id.* at 33.  Johnson's headaches last anywhere from five minutes to two

hours.  *Id.*  He stated that his head pounds 24 hours per day as a result of his headaches.  *Id.* at

37.  When he experiences a cluster headache, he is not able to read.  *Id.*  As a result of his

headaches, Dr. Zevova and Dr. Svoboda recommended that Johnson avoid bright lights, noise,

and high stress work environments.  *Id.* at 36.  Johnson testified that he had several seizures in

February 2009 and March 2009.  *Id.* at 38.  Johnson blacked out approximately five times in 2009.  *Id.* at 38-39.

He bought a bicycle in July 2008 and had an accident on the same day he purchased it because he became dizzy and light-headed prior to the onset of a headache.  *Id.* at 38.  He suffered a broken elbow, which has since healed.  *Id.*

As of the date of the hearing, Johnson was not taking any medication for anxiety or depression.  *Id.* at 35.  He has never been hospitalized for psychiatric reasons.  *Id.*

### C.  Evidence from Family Members

Tarhata Madrigal Polo-Johnson, Johnson's wife who lives and works in Hong Kong, submitted an undated letter on Johnson's behalf.  *Id.* at 263-64.  Polo-Johnson described Johnson's short-term memory difficulties that created marital conflict.  *Id.*  She also expressed concern that Johnson would injure himself because he often falls asleep while cooking.  *Id.* at 264.  She felt depressed that Johnson's lack of steady income prevented her from coming to Minnesota to take care of him.  *Id.* at 263-64.

Johnson's sister, Shelley, submitted a letter dated May 10, 2009 on Johnson's behalf.  *Id.* at 266.  Shelley observed Johnson pacing back and forth in his apartment due to anxiety and in anticipation of an on-coming headache.  *Id.*  She asserted that Johnson was no longer able to take part in family events or favorite pastimes.  *Id.*  She described witnessing the dramatic onset of Johnson's severe headaches where he would hold his head and cease talking mid-sentence.  *Id.*  She also believed that it was "very dangerous" for Johnson to cook unsupervised as a result of his black-outs and the potential danger the pure oxygen he used for his headaches posed while he cooked with natural gas.  *Id.*  She concluded that Johnson needed 24-hour home care and was unable to work as a result of his frequent cluster headaches.  *Id.*

Johnson's younger brother, Jeffrey, submitted a letter dated May 12, 2009, reciting Johnson's limitations.  *Id.* at 262.  Jeffrey asserted that Johnson no longer was able to go fishing, attend family barbeques and events, work on his home, or play cards as a result of his Horner's Syndrome and cluster headaches.  *Id.*  He also described Johnson's breathing and balance difficulties and those symptoms' effects on Johnson's ability to participate in family activities. *Id.*  The letter also described Johnson's 2008 bicycle accident and aversion to sunlight and noise as a result of his headaches.  *Id.*  Jeffrey observed Johnson anxiously pacing back and forth in his living room and that Johnson's blackouts precluded him from driving.  *Id.*  Jeffrey concluded that, "[Johnson] will have major trouble obtaining, sustaining, and keeping a job for the rest of his life.  He will never be the same. . . ."  *Id.* at 262.

Corey Sanders, Johnson's friend of ten years, submitted a letter dated May 12, 2009 in support of Johnson's SSDI application.  *Id.* at 265.  Sanders witnessed Johnson's blackouts on February 17, 2009 and March 20, 2009.  *Id.*  He asserted that Johnson has difficulties talking, forming sentences, and concentrating.  *Id.*  Sanders also described observing Johnson stop talking in the middle of a sentence as a result of a severe headache.  *Id.*  He stated that Johnson was disabled and needed home-care to prevent injury due to his blackouts and headaches and that Johnson's need for SSI was dire.  *Id.*

### D.  Medical Evidence

The day after his February 28, 2007 automobile accident, Johnson visited the Regions Hospital Emergency Room complaining of trauma to his left shoulder.  *Id.* at 291, 321, 340-342. Dr. Mary E. Carr was his treating physician.  *Id.*  Radiologist Dr. Joseph J. Braga reviewed Johnson's left shoulder x-rays and determined that there was no fracture.  *Id.* at 559.  Stephen

Wandersee, PA-C[1] issued a work release allowing Johnson to return to work on March 2, 2007, but prohibited him from lifting his left arm above his shoulder or lifting more than five pounds with his left arm. *Id.* at 291, 322, 324. He was prescribed Vicodin and Ibuprofen for pain. *Id.* at 324.

Two weeks later, Johnson was treated at Regions Hospital for bilateral shoulder pain, weakness, and a suspected rotator cuff tear. *Id.* at 335-40. Dr. Ralph S. Bovard of Hs2 Orthopaedics prescribed refills for Vicodin, Ibuprofen in addition to Nicotine patches, Prilosec, Tylenol Codeine, and Zantac 75. *Id.* at 520-24. Johnson also saw Elizabeth Loken, PA-C at Regions Hospital. Id. at 335-40. She diagnosed Johnson with bilateral shoulder impingement and a bilateral trapezius strain. *Id.* at 524. Ms. Loken also prescribed Johnson Tylenol #3 for pain. *Id.* Ms. Loken issued a workability report prohibiting Johnson from lifting, pushing or pulling more than 10 pounds or lifting his arm above shoulder level. *Id.* at 291, 524, 546. Dr. Susan M. Bagnoli, a radiologist, also reviewed Johnson's right shoulder x-rays. *Id.* at 557-58.

On March 17, 2007, Radiologist Dr. Nathan D. Block at Regions Hospital noted that Johnson's left shoulder had moderate severity tendinopathy, partial thickness tearing, and impingement. *Id.* at 336, 554-56. Dr. Block noted a moderate tendinopathy and low-grade partial tearing in Johnson's right shoulder. *Id.* at 337.

Johnson went to Regions Hospital for a follow-up bilateral shoulder MRI with orthopedist Dr. Heather Cichanowski for shoulder pain on March 22, 2007. *Id.* at 290, 515-20. Dr. Cichanowski referred Johnson to the HealthPartners Specialty Center for physical therapy. *Id.* at 290. Dr. Cichanowski noted that Johnson experienced tenderness around the coracoid and proximal biceps tendon and had limited internal rotation due to pain in both shoulders. *Id.* at

---

[1] A PA-C is a certified Physician Assistant. *Stedman's Medical Dictionary* 1493 (28th ed. 2006).

291.  She diagnosed Johnson with bilateral supraspinatus rotator cuff tendinopathy with a partial rotator cuff tear and bilateral shoulder impingement with the right shoulder more severe than the left shoulder.[2]  *Id.* at 291, 298-99, 515, 518.  She noted that Dr. Bovard also diagnosed Johnson with bilateral shoulder impingement and a bilateral trapezius strain.  *Id.* at 515.

Dr. Cichanowski gave Johnson Cortisone injections of Lidocane and Kenalog in both shoulders and imposed the same work restrictions as P.A. Wandersee did on March 1, 2007.  *Id.* at 291, 516.  On March 26, 2007, Dr. Cichanowski issued a workability report modifying Johnson's restrictions to lifting, pushing, or pulling less than five pounds and allowing him to drive six hours per day.  *Id.* at 291-92, 542.  She referred Johnson to three weeks of physical therapy.  *Id.* at 292.

On April 5, 2007, Johnson saw Courtney J. Smith, PA-C for a routine check-up where Johnson stated a concern about heart palpitations.  *Id.* at 505-07.  Johnson was not noted as having any anxiety issues or difficulty with his eyes.  *Id.* at 505.  Smith recommended, as several doctors before her had done, that Johnson stop smoking.  *Id.* at 506.  At that time, Johnson discontinued taking Prilosec and receiving Lidocaine and Kenalog injections.  *Id.* at 507.  Smith ordered an ECG to investigate Johnson's heart concerns.  *Id.*

On April 10, 2007, Johnson went to Medical Evaluations, Inc. ("MEI") for an independent orthopedic surgical examination by Dr. Asa Kim.  *Id.* at 288.  Dr. Kim was not a treating physician yet conducted a personal interview, examination, and review of all available medical records.  *Id.*  Dr. Kim described Johnson as athletic, muscular, and healthy-appearing

---

[2] Bilateral Impingement Syndrome or supraspinatus syndrome is fibrosis and tendonitis of the rotator cuff tendon.  *Stedman's Medical Dictionary*, Supraspinatus Syndrome, (27th Ed. 2000).  In patients over the age of 40, surgery is often required because the impingement mechanically disrupts the rotator cuff tendon.  *See* Thomas M. DeBerardino, "Shoulder Impingement Syndrome," Medscape, available at http://emedicine.medscape.com/article/92974-overview (last accessed June 24, 2011).

and noted that Johnson did not show any evidence of acute discomfort. *Id.* at 294. According to Dr. Kim, Johnson's chief complaints were bilateral shoulder pain, neck pain, headaches, and low back pain. *Id.* at 289. Her overall assessment of Johnson's injuries as a result of the February 28, 2007, accident was that Johnson had sprain and or strain injuries to his cervical spine and shoulder. *Id.* at 296. Dr. Kim concluded that the partial thickness rotator cuff tear on both shoulders and chronic impingement was not related to the car accident. *Id.* Johnson's treating physician, Dr. D'Amato, disagreed with Dr. Kim's assertion that Johnson's shoulder injury was preexisting and cited Dr. Bovard's diagnosis on March 13, 2007, two weeks after the accident. *Id.* at 348-349.

Dr. Kim observed that Johnson's shoulder pain was the primary problem with his left side being more painful than the right side. *Id.* at 289. His range of motion in his cervical spine was well maintained, though he had some pain in rotating his neck to the right. *Id.* at 294. Johnson also experienced mild pain with internal rotation of his right shoulder. *Id.* at 295.

Johnson complained to Dr. Kim of headache pain radiating from the back of his head that occurred approximately four times per week. *Id.* at 289. As of the date of Dr. Kim's medical evaluation, Johnson was taking Prilosec and aspirin. *Id.* at 292. Dr. Kim's opinion was that Johnson was limited to lifting less than 20 pounds up to waist level and less than five pounds above the waist and to avoid repetitive overhead activities. *Id.* at 297, 541. She estimated that the restrictions should last two weeks from the date of the accident. *Id.* at 297. She stated that Johnson was disabled from driving his taxicab for the first two weeks after the accident because driving a taxicab would involve the unexpected lifting of luggage for customers. *Id.* at 298.

On April 12, 2007, Johnson saw Dr. Cichanowski again at the Health Partners Specialty Center Orthopedic Clinic in Saint Paul. *Id.* at 500-04. She diagnosed Johnson with

supraspinatus rotator cuff tendinopathy and a partial rotator cuff tear in both shoulders. *Id.* at 502. She reported that Johnson was 45 percent better as a result of physical therapy and Cortisone injections. *Id.* In a report of work ability, she changed his work restrictions to prohibiting lifting, carrying, or pulling over twenty pounds and authorized Johnson to drive up to eight hours per day. *Id.* at 541.

On May 11, 2007, Johnson had a follow-up visit with Dr. Cichanowski for bilateral shoulder pain. *Id.* at 488. She noted that Johnson could lift up to 50 pounds without pain and that Johnson had no additional symptoms since she last saw him. *Id.* at 488, 490. Specifically, she stated that "patient is in no acute distress." *Id.* at 488, 490. She wrote a work ability form prohibiting Johnson from lifting more than 50 pounds for the next two weeks and referred him for two more physical therapy sessions. *Id.* at 489.

Between March 23, 2007 and May 24, 2007, Johnson saw physical therapist Lee X. Korthof for his bilateral shoulder impingement syndrome ten times on Dr. Ralph Bovard's referral. *Id.* at 484-85, 507-513. At his initial visit on March 23, 2007, his work restriction was to lift less than five pounds. *Id.* at 513. Johnson reported difficulty getting dressed without pain. *Id.* at 512. On April 17, 2007, Korthof lifted some of Johnson's work restrictions and allowed him to lift up to 20 pounds and drive for up to eight hours per day. *Id.* at 499. Korthof noted on May 13, 2007 that Johnson comfortably lifted 50 pounds from the floor and tolerated catching and tossing a 10-pound medicine ball. *Id.* at 492. On a May 17, 2007 visit, Korthof opined that Johnson was prohibited from carrying over 50 pounds for two weeks. *Id.* at 486. Korthof also wrote "[I] [t]hink [the patient] will be ready to return to work full duty as a cab driver." *Id.* at 487. As of May 24, 2007, Johnson's shoulder pain and disability index improved to a pain scale of 8% and a disability scale of 1%. *Id.* at 485. As of his final appointment on May 26, 2007,

Johnson was able to "comfortably lift" a 75-pound box from the floor and "tolerated continuous activity based on rehab [for] the entire session." *Id.* at 485, 487.  Korthof also noted that Johnson said he was physically ready to drive 12-hour shifts and carry 75-pound loads.  *Id.* at 485.

On July 20, 2007 Johnson saw Dr. Cichanowski complaining of shoulder and low back and neck pain.  *Id.* at 302, 480-84.  Johnson had completed formal physical therapy and was no longer performing his physical therapy exercises.  *Id.* at 302, 482.  He stated that the pain with overhead motions was becoming worse, which may have been a result of another motor vehicle accident three days earlier.  *Id.* at 302, 482.  Dr. Cichanowski diagnosed Johnson with a bilateral supraspinatus tendinopathy with partial rotator cuff tear, low back pain with no radiation, and a right cervical strain.  *Id.* at 483.  To mitigate Johnson's pain, she administered Cortisone injections containing Lidocaine in both shoulders.  *Id.* at 303, 483.   Johnson also received injections of Triamcinolone Acetonide in his hip and knee.  *Id.* at 484.  Dr. Cichanowski referred Johnson to physical therapy and to a specialty clinic to evaluate surgical options for his shoulder pain.  *Id.* at 303, 483.

On July 31, 2007, Johnson saw Dr. Cichanowski's consultation referral, Dr. Kevin J. Mullaney, at the Twin Cities Spine Center.  *Id.* at 305-06.  Dr. Mullaney assessed Johnson as having cervical whiplash and lumbar spasms.  *Id.* at 307.  Mullaney's treatment plan included anti-inflammatory medications, quitting smoking, physical therapy, limited work, and follow-up visits as needed.  *Id*.  Dr. Mullaney issued a workability form indicating that Johnson was unable to work from July 31, 2007 to August 19, 2007.  *Id.* at 308.

On August 1, 2007, Johnson had a consultation with Dr. Michael J. D'Amato at the request of Dr. Cichanowski for his shoulder pain because the Cortisone injections were not adequately resolving his pain.  *Id.* at 346, 477-80.  Dr. D'Amato recommended rotator cuff

surgery on Johnson's left shoulder because the more conservative treatments proved ineffective. *Id.* at 346, 477, 479.  In an Orthopedics Medical History Form dated August 1, 2007, Johnson reported pain of seven on a scale of ten in both shoulders, which began five months prior, in addition to back pain.  *Id.* at 539-40.

On September 7, 2007, Johnson saw Dr. Mastin for a pre-operative exam in advance of his September 11, 2007 shoulder surgery.  *Id.* at 472-477.  As of that date, Johnson was taking Penicillin, Acetaminophen-Codeine, and Prilosec.  *Id.* at 473.  Dr. Mastin noted that Johnson had gastroesophageal reflux, pink eye, high cholesterol, and tobacco use disorder.  *Id.* at 473. Johnson's physical complaints included back pain, headaches, anxiety, dental problems, and difficulty sleeping.  *Id.* at 474, 553.  He was also noted to have shortness of breath at night and during waking activity.  *Id.* at 475.  Johnson was cleared for surgery.  *Id.*  Dr. Mastin discontinued and did not re-prescribe the following medications: Tylenol PM Extra Strength, Lidocaine HCL, Kenalog injections, and Ibuprofen.  *Id.* at 476.

On September 11, 2007 at Regions Hospital, Johnson underwent surgery on his left shoulder to correct the impingement and joint arthritis.  *Id.* at 314-321.  He received anesthesia through an interscalene block.[3]  *Id.*  Dr. Michael J. D'Amato performed the surgery with Mike R. Timm, MS, PA-C assisting.  *Id.*

Eight days after his left shoulder surgery, on September 19, 2007, Johnson saw Dr. D'Amato for a follow-up visit; Johnson appeared to be healing well.  *Id.* at 468-69.  In his Health Partners questionnaire, Johnson listed experiencing pain of six on a scale of ten in his left

---

[3] An interscalene block is typically administered through the cervical nerve roots in a patient's neck.  Daniel Amituke, "Interscalene Brachial Plexus Block," 9 *Practical Procedures*, at *1 available at http://www.nda.ox.ac.uk/wfsa/html/u09/u09_015.htm (last accessed June 24, 2011).

shoulder.  *Id.* at 538.  He requested a form stating that he was unable to work and reported taking narcotics for pain.  *Id.* at 538.

After his left shoulder surgery, Johnson saw physical therapist Timothy C. Hatlestad nine times between September 14, 2007 and December 14, 2007.  *Id.* at 451-55.  Hatlestad noted that Johnson was recovering well from his shoulder surgery and that he had achieved a "very good" range of motion.  *Id.* at 452.  On September 17, 2007, physical therapist Jennifer L. McSherry reported that sleeping, carrying, driving, overhead reaching, dressing, and washing his face and brushing his teeth were all aggravating factors for Johnson's shoulder pain.  *Id.* at 470. McSherry also noted that Johnson was off work due to his shoulder injury and said that he could not report back to work until he could drive twelve hours per day and lift 75 pounds.  *Id*.  She also noted that Johnson was unable to reach or carry items at that time.  *Id*.  Johnson reported pain of four to five out of ten on September 24, 2007.  *Id.* at 466.  At physical therapy sessions on September 28, 2007 and October 23, 2007, Hatlestad noted that Johnson rated his shoulder pain as a three out of ten.  *Id.* at 458, 465.  In a Health Partners follow-up questionnaire dated October 5, 2007, Johnson reported experiencing dull, intermittent pain of seven on a scale of ten in his left shoulder.  *Id.* at 537.

On October 10, 2007, Johnson saw Dr. D'Amato for a post-surgery follow-up appointment.  *Id.* at 460-62.  He noted that Johnson was working on his range of motion and that his arm was out of his sling as part of his recovery.  *Id.* at 461-62.  As of October 10, 2007, Johnson was taking Oxycodone, Hydroxyzine Pamoate, Penicillin, and Acetaminophen-Codeine. *Id.* at 462-63.  D'Amato told Johnson to discontinue taking Penicillin and Acetaminophen-Codeine at that time because they were no longer needed.  *Id*.

On November 7, 2007, Johnson had his second post-surgery follow-up visit with Dr. D'Amato.  *Id.* at 455-58, 535.  Dr. D'Amato recommended rotator cuff surgery on Johnson's right shoulder because his pain was becoming "chronic" and his shoulder was not yet adequately strengthened.  *Id.* at 456-57.  In a Health Partners follow-up questionnaire dated November 7, 2007, Johnson reported dull pain in his left shoulder at a level of three out of ten.  *Id.* at 534.  Johnson asserted that he was feeling 60 percent better than in his previous month's visit.  *Id.*  He did not list any new conditions or medications.  *Id.*

On December 19, 2007, Dr. D'Amato saw Johnson on a third post-surgical follow-up visit, where Johnson reported some mild soreness.  *Id.* at 448-451.  Dr. D'Amato referred Johnson to physical therapy and reported that Johnson was healing well from surgery on his left shoulder.  *Id.* at 450-51.  In a Health Partners follow-up questionnaire, Johnson reported having pain in his left shoulder, intermittent pain of two on a scale of ten that kept him from sleeping, and that he started taking Ibuprofen.  *Id.* at 532.  He also indicated that he was 50 percent better than he felt at his visit one month earlier.  *Id.*

On January 18, 2008, Johnson saw Dr. Mastin at Regions for a pre-operative exam for his right shoulder surgery.  Johnson complained of shoulder joint pain, eye redness and tearing.  *Id.* at 444-447.  And he also complained of waking at night with shortness of breath and difficulty breathing, which Dr. Mastin suspected was a result of a pulmonary condition.  *Id.* at 446.  He prescribed Sulfacetamide Sodium for Johnson's eye redness, prescribed a second antibiotic for pink eye, and recommended that Johnson cease smoking and use of alcohol.  *Id.* at 447.

In a January 21, 2008 letter to Attorney Michael E. Marks, Dr. D'Amato stated that Johnson was disabled as of August 1, 2007 as a result of his shoulder injuries.  *Id.* at 344.  He described Johnson's diagnosis as a left rotator cuff tear and a right rotator cuff tendonitis with

impingement syndrome and AC joint arthrosis. *Id.* Dr. D'Amato opined that these conditions prevented Johnson from working as a cab driver but would allow him to perform sedentary activities from August 1, 2007 to September, 11, 2007. *Id.* at 344-45. He estimated that Johnson would be unable to work as a cab driver for three to six months following the surgery on his right shoulder. *Id.* at 345.

On January 24, 2008 at Regions Hospital, Johnson underwent surgery on his right shoulder to correct the impingement and repair his rotator cuff. *Id.* at 312. Dr. D'Amato performed the surgery. *Id.* General anesthesia was administered through an interscalene block. *Id.*

On January 26, 2008, Johnson was treated at the North Memorial Emergency Room by Dr. Katie Voight for right shoulder pain following his January 24, 2008 shoulder surgery. *Id.* at 370-71. Dr. Voight diagnosed post-operative pain and noted that the surgical wound appeared to be healing and that Johnson "looks well." *Id.* at 371. Before discharging Johnson, Voight prescribed Percocet for pain, Flexeril to mitigate the muscle spasm Johnson may have been experiencing. *Id.* At a post-operative visit on February 4, 2008, Dr. D'Amato discontinued Johnson's Oxytocin prescription. *Id.* at 444.

In a Health Partners questionnaire received on February 14, 2008, Johnson reported severe pain on a scale of seven out of ten in his shoulder. *Id.* at 531. He reported the morphine prescribed for post-operative pain prevented him from sleeping. *Id.* He also requested that the doctor take out his stitches, prescribe more medications, and provide him with a work ability form. *Id.*

In a letter dated February 14, 2008 addressed to Disability Examiner Tabitha Farness, Dr. D'Amato stated that Johnson's shoulder injuries were permanent and that his left shoulder would

rate at 5 percent and his right shoulder would rate at 9 percent for a total of 14 percent for permanent partial disability under the Minnesota Department of Labor and Industry Disability Schedule. *Id.* at 348-350, 594-96. Dr. D'Amato further opined that Johnson would permanently be unable to life more than 30 pounds outstretched or overhead but would not have any restrictions lifting to waist height. *Id.* at 350, 596. Dr. D'Amato ascribed all of these restrictions to Johnson's February 28, 2007 car accident. *Id.*

On February 26, 2008, Johnson saw Dr. Mastin complaining of eye pain, nasal congestion, and headaches. *Id.* at 430-34. Dr. Mastin noted that a brain, eye socket, and sinus MRI came-up normal. *Id.* at 434. Dr. Mastin ordered an MRI scan of Johnson's head and brain noting that nerve damage from anesthesia may have been the cause of Johnson's pain. *Id.* at 331-333; 434-36.

On February 27, 2008, Dr. William N. Lisberg examined Johnson for eye pain and headaches at North Memorial Hospital. *Id.* at 364-68, 563-66. Dr. Lisberg conducted a brain MRI that did not reveal any abnormalities. *Id.* at 365-67, 563, 565. Johnson's optic nerve and sinuses were also normal. *Id.* at 367-68, 563, 565.

On February 28, 2008, Johnson saw Dr. Joann Reed at a Health Partners clinic for an office visit complaining of ptosis of the eyelid. *Id.* at 429-30. At the time, he was taking the following medications: Oxycodone, Flonase, breathe right strips, Sulfacetamide Sodium, Prilosec, Hydroxyzine Pamoate, and Sulfacetamide Sodium. *Id.* at 429.

On March 3, 2008, Johnson saw Dr. Mastin. *Id.* at 423-26. Dr. Mastin's notes summarized Johnson's various bouts with Horner's Syndrome and headaches that began with Johnson's September 11, 2007 shoulder surgery, abated four days later and then returned in December 2007. *Id.* at 424. Using Oxycodone, Johnson could mitigate his cluster headache pain

down from ten out of ten to two out of ten. *Id.* During his headache episodes, many of which lasted up to 30 minutes, Johnson had trouble breathing out of his left nostril. *Id.* The episodes occurred almost daily. *Id.* Dr. Mastin prescribed portable oxygen and referred him for a neck MRA[4] and formal neurological evaluation. *Id.* at 424-25. Dr. Mastin's follow-up note on March 7, 2008, reflected that after a neurology consult, carotid dissection was ruled out as the cause of Johnson's headaches and Horner's Syndrome. *Id.* at 425, 551.

On March 3, 2008, Johnson also saw Dr. D'Amato for a six week post-operative visit. *Id.* at 427-28. Dr. D'Amato noted that Johnson was going to begin having an active range of motion now that he no longer needed to use a sling on his right shoulder. *Id.* In a Health Partners follow-up questionnaire, Johnson listed his drooping left eye as a new medical condition that was not evaluated at his previous visit. *Id.* at 530. Johnson was experiencing pain in his right shoulder and was taking Oxycodone for the pain. *Id.* He listed his pain as four on a scale of ten. *Id.* He also listed experiencing headaches and sinus problems and checked a box indicating that he was not working do to his medical conditions. *Id.* As of March 3, 2008, Johnson still smoked. *Id.*

On March 6, 2008, Johnson was treated by Dr. Alexander C.W. Lai for headaches. *Id.* at 362-363. Dr. Lai conducted a cardiac angiogram that was normal. *Id.* at 363. He did, however, note Horner's Syndrome as a condition in the clinical data section of his report. *Id.* at 362.

On the same date, Johnson also saw neurologist Dr. Mario R. Quinones for an evaluation of his droopy eyelid and strong headaches that began in December 2007. *Id.* at 419-21. The headaches were severe in December 2007 and January 2008, yet oxygen treatment was effective

---

[4] An MRA is a magnetic resonance angiogram, which is a noninvasive test that serves as a complement to an MRI. *Stedman's Medical Dictionary*, Magnetic Resonance Angiography, (27th ed. 2000).

in mitigating Johnson's pain.  *Id.* at 419.  Dr. Quinones' observed, "Now the headaches are almost gone" and stated that Johnson's brain MRI and carotid artery MRA did not show any signs of abnormality.  *Id.*  Johnson also complained of occasional back pain and insomnia.  *Id.*  Dr. Quinones described Johnson as a smoker who drinks alcohol periodically.  *Id.*  He noted that Johnson's left pupil did not dilate as fully as the right pupil and observed a degree of hypethesia[5] on the left side of Johnson's forehead.  *Id.*  Dr. Quinones prescribed a trial of Tegretol to be taken with Carbatrol for Johnson's cluster headaches.  *Id.* at 420.  He also noted that Johnson stopped taking Oxycodone, breathe right strips, Flonase, Hydroxyzine Pamoate, and Sulfacetamide Sodium.  *Id.*

On March 7, 2008, an MRA was performed on Johnson's brain and cervical spine at North Memorial.  *Id.* at 561-62.  The unsigned report stated that carotid dissection was likely not the cause of Johnson's neurological symptoms.  *Id.*

On March 11, 2008, Johnson saw Dr. Mastin complaining of cluster headaches occurring ten to twelve times per day and complications from his rotator cuff surgery.  *Id.* at 416.  Johnson said that oxygen helped but did not entirely alleviate his headaches.  *Id.*  Dr. Mastin noted that Johnson was unable to work but might be able to return to work if he "promptly" responded to headache treatments.  *Id.*

On March 11, 2008, Dr. D'Amato issued a letter stating that Johnson would be unable to attend work from March 11, 2008 to June 11, 2008 due to his shoulder surgery recovery, inability to be alert as a result of taking prescribed medications, and complications due to Horner's Syndrome and cluster headaches.  *Id.* at 351, 597.  He explained that Johnson could not

---

[5] "Hypethesia" is a diminished sensitivity to stimulation.  Stedman, *supra* note 2, at 929.

work unless his cluster headaches, occurring approximately ten times per day, subsided because he was unable to function during a headache and needed to lie down and use oxygen.  *Id*.

On March 26, 2008, Johnson complained of cluster headaches and anxiety problems to Dr. Mastin during a clinic visit.  *Id.* at 409-410.  Mastin characterized Johnson's condition as "atypical cluster headaches" and that Johnson seemed to "go only an hour between headaches." *Id.* at 409.  Johnson was also not sleeping well.  *Id.* at 409.  Johnson told Dr. Mastin about his plans to travel to Hong Kong for a week to meet and marry his wife.  *Id*.  Johnson stated that he would try to make the trip without oxygen due to the difficulty in arranging for oxygen in Hong Kong.  *Id*.  Dr. Mastin advised Johnson to take Tegritol as needed and made a note to screen Johnson for situational depression if his insomnia and nervousness persisted.  *Id.* at 410. Johnson was continuing to use oxygen.  *Id.* at 409.

On March 31, 2008, Johnson saw Dr. Stephen J. Swanson for a travel consult for his five day trip to Hong Kong in April.  *Id.* at 404-07.  Dr. Swanson administered several vaccines in preparation for Johnson's trip to Hong Kong and a prescription for anti-anxiety medication to ease his fear of flying.  *Id.* at 406, 408.

Dr. D'Amato saw Johnson in follow-up visits on April 2, 2008 and May 19, 2008.  Dr. D'Amato noted that Johnson was healing appropriately from his right shoulder surgery.  *Id.* at 392-394; 402-03.  In a Health Partners follow-up medical questionnaire dated April 3, 2008, Johnson claimed that he felt 40 percent better than he did at his visit one month prior.  *Id.* at 529. He listed Horner's Syndrome in the medical problem section and wrote that he was taking Carbatrol as a new medication.  *Id*.  He reported continuing to experience pain in his right shoulder and was not working as a result of that condition.  *Id*.

On April 7, 2008, Johnson was treated by Dr. Mastin in a follow-up visit. *Id.* at 398-400. At that time, Johnson was taking Azithromycin, Xanax, Fluticasone Florate nasal spray (taken for nose congestion as a result of Horner's Syndrome), Carbatrol, Oxycodone, and Omeprazole (taken for acid reflux). *Id.* at 398. Dr. Mastin noted that Johnson was not taking Carbatrol because he was concerned with potential side effects such as jaundice in the event of an adverse interaction with his travel shots. *Id.* Dr. Mastin questioned the severity of Johnson's cluster headaches given that Johnson was planning an ambitious trip to Hong Kong and seemed uninterested in prophylactic medications. *Id.* at 399. Dr. Mastin's note stated, "If [the patient] is really suffering from cluster headaches, [he] would be well-advised to take prophylaxis." *Id.* He did, however, observe "objective evidence of Horner's Syndrome." *Id.*

On April 9, 2008, neurologist Dr. Shelly Svoboda treated Johnson at the Noran Neurological Clinic in Fridley for stabbing pain behind his left eye that occurred up to ten times per day. *Id.* at 352-353, 587-89. Johnson sought a second opinion at the Noran Clinic rather than Health Partners because he was wary of Health Partners, where he had the anesthesia complication that led to his Horner's Syndrome. *Id.* at 398-400. Dr. Svoboda described Johnson as having "fairly classic Horner's Syndrome" after his left rotator cuff shoulder surgery in September 2007. *Id.* at 587. Johnson began having excruciating headaches after his left rotator cuff surgery. *Id.* These headaches sometimes occurred ten times per day and could last an hour. *Id.* She concurred with neurologist Dr. Quinones' diagnosis of Horner's Syndrome with cluster headaches. *Id.* She also noted that Dr. Quinones prescribed Tegretol but that Johnson "did not choose to start this medication." *Id.* Dr. Svoboda described Johnson's head pain as "intractable and unpredictable," which made it "impossible for him to operate a motor vehicle." *Id.* She also

believed that, "the headaches are severe enough that he is simply not able to hold any type of employment." *Id*.

Dr. Svoboda also diagnosed Johnson with a cervical spine injury and cluster headaches. *Id*. at 588. Johnson agreed to start taking Tegretol after some blood testing. *Id*. If this treatment was ineffective, Dr. Svoboda would consider prescribing Lithium or Verapamil, which were "classic cluster headache treatment[s]." *Id*. As of April 9, 2008, Johnson was taking Omeprazole, Carbatrol, and Naprosyn. *Id*. at 588-89.

On May 4, 2008, Johnson was treated at North Memorial by Dr. Jeffrey R. Gambach for headaches and suspicion of heart problems. *Id*. at 360-62. Dr. Gambach performed several cardiovascular tests, which came up normal. *Id*. at 362.

In a Health Partners questionnaire dated May 19, 2008, Johnson noted pain in his right shoulder and that he was taking Carbotrol for pain. *Id*. at 528. He was feeling 30 percent better than his visit two months prior and that his pain was a two on a scale of ten. *Id*. He reported experiencing pain intermittently that would wake him occasionally. *Id*. He was not working due to his shoulder condition. *Id*.

On May 23, 2008, Johnson was treated at the North Memorial Emergency Room by Dr. Jeffrey N. Elder with concerns about the side effects of the Carbatrol, which was prescribed for his Horner's Syndrome and cluster headaches. *Id*. at 368. Johnson claimed side effects including a persistent cough, shortness of breath, wheezing, and shooting pain up his left arm and hand. *Id*. at 368-69. Johnson said that Carbatrol was helping with his cluster headaches and did not report having any seizures. *Id*. at 368-99. Dr. Elder discharged Johnson, prescribed Doxycycline and Prednisone for his bronchitis and asked Johnson to contact his neurologist regarding whether he should continue to take Carbatrol for his headaches. *Id*. at 369.

Dr. D'Amato referred Johnson to outpatient physical therapy after rotator cuff surgery on his right shoulder. *Id.* at 390-92; 395-97; 400-02; 411-14; 421-23; 430-32; 436-443. He attended eleven sessions between January 24, 2008 and June 5, 2008. On February 8, 2008, physical therapist, Wendy A. Ebeling, noted that Johnson said he was not taking his pain medication but that sleeping more than 1-2 hours at a time was difficult for him. *Id.* at 441. At his visit on February 12, 2008, Ebeling noted that Johnson inexplicably was not taking pain medications. *Id.* at 440. She also reduced his visits from twice per week to once per week. *Id.* at 441. At Johnson's March 6, 2008 physical therapy appointment, Ebeling suggested obtaining a TENS unit for pain relief. *Id.* at 578. At his final visit on June 5, 2008, Ebeling noted that Johnson's left shoulder was at 90 percent of normal and that "his pain levels in the right shoulder are good." *Id.* at 390.

On June 2, 2008, Johnson returned to the Noran Neurological Clinic for a follow-up visit with Dr. Svoboda for his cervical sympathetic nerve injury, Horner's Syndrome, and cluster headaches. *Id.* at 585. Dr. Svoboda started Johnson on Carbatrol several months prior, but he stopped taking the drug on his Hong Kong trip. *Id.* Johnson reported that once he started taking Carbatrol twice per day, his headaches "abated quite a bit," but his pain had returned as before. *Id.* Dr. Svoboda also noted evidence of ptosis[6] of Johnson's left eye. She listed Johnson's diagnosis as Horner's Syndrome with head pain and noted that he was responding to treatment. *Id.* She also wrote, "[b]ecause he is having so many episodes of pain per day, he is just simply not able to go back to work yet." *Id.* Johnson continued to take Carbatrol and Naprosyn. *Id.*

On August 3, 2008, Johnson was treated at North Memorial Urgent Care in Robbinsdale for an injury sustained to his hand after a bike accident. *Id.* at 358-60. Dr. Keith J. Edinburgh

---

[6] "Ptosis" is a sinking down or prolapse. Stedman, *supra* note 2, at 1600.

did not diagnose a fracture or dislocation in his left hand but noted an irregularity of the radial neck and suspected a radial neck fracture. *Id.*

On August 5, 2008, Johnson saw Dr. Jackie Schechinger at the Health Partner's Orthopedic Clinic at Regions Hospital for his left elbow and hand injury. *Id.* at 385-90. Johnson was discharged and given a work form stating that he was unable to work for two months as a result of the injury. *Id.* at 388. He was prescribed Oxycodone in addition to the other medications he was taking including Carbatrol. *Id.* at 389.

On August 8, 2008, Johnson visited Regions Hospital for a left finger sprain and broken elbow he suffered after the bicycling accident. *Id.* at 330-331. Dr. Keith Mastin diagnosed him with a closed radius head fracture. *Id.* at 330. He was diagnosed with a fifth left finger fracture on September 2, 2008 by Dr. Adolfo Woc Chuy and was given a splint. *Id.* at 327-330. Dr. Thomas A. Lange's subsequent Health Partners work ability report recommended that Johnson not return to work until October 6, 2008 as a result of his elbow and hand injury. *Id.* at 354.

On August 12, 2008, Johnson saw neurologist Dr. Svoboda for a follow-up visit for his headaches and cervical spine pain. *Id.* at 583-84, 680-81. He reported that his headaches dramatically improved on Carbatrol and that he was getting only four headaches per day. *Id.* at 583, 680. He also stated that he was disabled from his cab driving position because he could no longer lift suitcases as a result of his shoulder injuries. *Id.* Dr. Svoboda also reported that Johnson continued to have weakness and tearing in his left eye. *Id.*

On September 2, 2008, Johnson saw Dr. Thomas A. Lange at the Health Partner's Orthopedic Clinic following up on earlier visits relating to his elbow and finger injuries. *Id.* at 381. Dr. Lange did not prescribe additional medications or treatment for Johnson at that time. *Id.* at 382-84.

On September 10, 2008, Dr. Joann Reed treated Johnson at an office visit at Health Partner's Clinic for pain with his upper right eyelid that started three weeks prior. *Id.* at 376. Dr. Reed observed a lump and irritation; Johnson reported pain of four on a scale of ten when he blinked his right eye. *Id.* Dr. Reed diagnosed chalazion, which is a bump caused by inflammation of an oil gland located in the eyelid. *Id.* at 376-377. She instructed Johnson to apply a warm compress on his upper right eyelid for five minutes three or four times per day and recommended minor corrective surgery if the condition did not improve in one month. *Id.* at 376. Dr. Reed noted that Johnson was taking Carbatrol, Fluticasone nasal spray, and Xanax for anxiety. *Id.* at 377.

At the same visit on September 10, 2008, Dr. Mario R. Quinones conducted a neurology consult of Johnson. *Id.* at 379. Dr. Quinones had seen Johnson previously on March 6, 2008, when he observed Horner's Syndrome in Johnson's left eye and prescribed Carbatrol for his cluster headaches. *Id.* At the September 10, 2008 visit, Johnson complained of head pressure, sensitivity to light, and sharp pain on his left side. *Id.* Dr. Quinones was unsure as to whether Johnson would continue to need to take Carbatrol because it was not preventing Johnson's daily headaches. *Id.* Johnson told Dr. Quinones that he was unable to go to work as a result of his headaches; Dr. Quinones prescribed Tegretol and Carbatrol. *Id.* at 379-380.

In a letter dated September 16, 2008, Dr. Svoboda opined that the damage to Johnson's left eyelid as a result of Horner's Syndrome was permanent. *Id.* at 352-53, 581-82, 598. She also noted that Johnson's headaches caused him difficulty throughout the day and made it challenging for Johnson to function in any type of employment, rendering him unable to work as a taxicab driver. *Id.* She described his head pain as "severe and unpredictable" and suggested

that his headaches compromised his ability to maintain meaningful future employment. *Id.* at 352, 581, 598.

On September 25, 2008, Johnson saw Christopher Geisler, PA-C at the Noran Clinic. *Id.* at 579-80, 591-92, 678-79. At the visit, he complained of daily headaches and dizziness. *Id.* at 579, 591, 678. Johnson estimated that he was experiencing approximately six headaches per day that lasted longer than his previous headaches. *Id.* He started taking Carbatrol, which Dr. Svoboda prescribed in August, but he was not taking the additional 100mg dose that Dr. Svoboda recommended at nighttime. *Id.* Johnson also requested a letter stating that he was unable to drive when he was taking Carbatrol. *Id.* At the time of this visit, Johnson was on the following medications: Carbatrol, Naprosyn, Zantac, Ambien, Acetaminophen-Codeine, and Flonase nasal spray. *Id.* The problems listed included a cervical sympathetic nerve injury, Horner's Syndrome, and cluster headaches. *Id.* at 580, 592, 679. Geisler stated that he did not see why Johnson could not drive. *Id.*

On October 3, 2008 Sylvia Ann Johnson, Johnson's mother, completed a Third-Party Function Report on Johnson's behalf. *Id.* at 200-09. She recounted spending eight hours per day with Johnson including accompanying him to doctors' appointments and grocery shopping. The Report did not contain any details about his ability to make meals, do house and yard work, shop, get around, and take care of his personal hygiene. *Id.* She did note, however, that Johnson often became confused when counting money and that since his headaches began did not like being around people. *Id.* at 206-07. Sylvia stated that as a result of his headaches Johnson had difficulty talking, seeing, remembering, completing tasks, concentrating, understanding, following instructions and getting along with others. *Id.* at 207. Johnson could only pay

attention for five minutes at a time and could not tolerate social situations, stress, or effectively follow spoken instructions. *Id.* at 208.

Johnson also completed a work history report on October 4, 2008. *Id.* at 187-198. In the past fifteen years, he worked as a cab driver, bill collector, bus driver, store clerk, slot machine repairman, and deliverer. *Id.* at 187. These positions ranged from requirements of lifting less than ten pounds to 100 pounds and varied between positions that required over six hours of walking and standing to positions requiring less than one hour of standing per day. *Id.* at 187-98.

Johnson completed a function report on October 5, 2008. *Id.* at 176-83. Johnson described his daily routine and stated that he lived alone without the assistance of others. *Id.* at 177. He asserted that his illness affected his ability to sleep, think, and concentrate and also made him constipated. *Id.* He reported forgetting that things were cooking on the stove and often failing to take care of his personal hygiene and housework. *Id.* at 178. He left his house several times per month to buy necessities, though he sometimes had difficulty counting change. *Id.* at 179-80. As a result of his impairments, he was unable to enjoy his former hobbies such as playing sports, watching TV, playing golf, growing vegetables, and playing cards. *Id.* at 180. He also reported having difficulty concentrating and remembering things he did five seconds ago as a result of his illnesses and injuries. *Id.* His only social contact was daily conversations via computer; he expressed an inability to interact with other people due to the fear of loud noises that trigger his headaches. *Id.* at 180-81. His impairments affected the following activities: lifting and reaching, talking, listening, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others. *Id.* at 181. He asserted that he could only pay attention for two minutes and could not follow spoken

instructions or get along with authority figures very well.  *Id.* at 181-82.  Johnson reported not being able to handle stress very well, thinking of suicide.  *Id.* at 182.

On October 25, 2008, state agency medical consultant Dr. Charles T. Grant issued a Physical Residual Functional Capacity Assessment ("RFC Assessment") for Johnson listing a primary impairment of shoulder surgery, a secondary impairment of elbow fracture, and an additional impairment of Horner's Syndrome.  *Id.* at 610.  Examiner Tabitha Farness requested that Dr. Grant provide an RFC Assessment for a 48-year-old claimant alleging Horner's Syndrome, cluster headaches, and shoulder problems.  *Id.* at 609.  Grant's RFC Assessment stated that Johnson could lift 20 pounds occasionally, frequently lift ten pounds and stand, sit, or walk six hours in an eight hour work day with normal breaks.  *Id.* at 611.  Johnson's ability to push or pull using his hands and feet was unlimited.  *Id.*  Grant also noted that Johnson had Horner's Syndrome and was diagnosed with cluster headaches, though prophylactic treatment was helping with Johnson's head pain.  *Id.*  He stated that Johnson's "head pain is credible and reduces the RFC to light."  *Id.* at 615.  Dr. Grant did not note any postural, manipulative, visual, communicative, or environment limitations.  *Id.* at 612-14.

Dr. Grant observed that Dr. Svoboda's findings were significantly different than his findings with respect to Johnson's work restrictions.  *Id.* at 616.  Specifically, Grant stated that Dr. Svoboda's September 16, 2008 letter contained a "statement reserved to the commissioner" but did not specify to which statement he was referring.  *Id.*

On October 27, 2008. Johnson saw Dr. Alford Karayusuf for a mental health evaluation in conjunction with Minnesota Disability Determination Services in cooperation with the Social Security Administration.  *Id.* at 618-21.  Dr. Karayusuf identified Johnson's chief complaints as Horner's Syndrome and cluster headaches.  *Id.* at 619.  Johnson said he had 20 cluster headaches

each day and had difficulty concentrating and reading, sensitivity to loud noises, and involuntary muscle reactions.  *Id.*  Johnson also said that he only sweats on one side of his face and that his left eye tears and runs on the left side.  *Id.*  Dr. Karayusuf reviewed Johnson's medical records from Health Partners and various letters from Drs. D'Amato, Mastin, and Svoboda.  *Id.*

Dr. Karayusuf described Johnson's daily routine including his bathing once per week, cooking for himself, and going shopping once or twice per month.  *Id.* at 620.  Johnson used the bus to get around and reported that he had not been doing laundry lately due to his lack of coins to run the machines.  *Id.*  Johnson's mental status demonstrated average intelligence and good digit recall.  *Id.*  Johnson had good eye contact and did not show any psychomotor retardation. *Id.*  Johnson occasionally had suicidal thoughts and experienced hallucinations of "mice moving and something flying around the room."  *Id.*  Johnson reported seeing Dr. Svoboda for his emotional and neurological issues.  *Id.*

Dr. Karayusuf diagnosed Johnson with an adjustment disorder with an anxious and depressed mood.  *Id.* at 620.  He concluded that Johnson was able to follow, understand, and retain simple instructions and interact appropriately with fellow workers, supervisors, and the public.  *Id.*  Johnson was also able to maintain pace and persistence.  *Id.*

On October 29, 2008, James M. Alsdurf, Ph.D., LP completed a psychiatric review of Johnson dating back to his asserted date of disability, February 28, 2007.  His review was based on Listing 12.06 for anxiety-related disorders.  *Id.* at 623.  Specifically, Alsdurf concluded that Johnson's adjustment disorder with anxious depressed mood was a medically determinable impairment that did not satisfy the diagnostic criteria in Listing 12.06.  *Id.* at 628.  Dr. Alsdurf did not note any psychological, behavioral, abnormalities, nor did he conclude that Johnson had

any affective, somatoform, personality disorders, mental retardation, autism, or substance addiction.  *Id.* at 624-32.

Dr. Alsdurf's rating of functional limitations categorized his daily living restrictions as "mild" and his difficulties in maintaining social functioning, concentration, persistence, and pace as "moderate."  *Id.* at 633.  Dr. Alsdurf did not find that the evidence established the presence of Listing 12.05C criteria.  *Id.* at 634.  His comments were consistent with Dr. Karayusuf's assessment with respect to Johnson's depression, occasional suicidal thoughts, and hallucinations.  *Id.*  He noted that Johnson socialized with others via computer but had problems handling stress and holding conversations if the conversations became too long or loud.  *Id.* at 635.  Dr. Alsdurf concluded that Johnson had a severe impairment that did not meet any of the Listing criteria.  *Id.*

Dr. Alsdurf also completed a Mental Residual Capacity Assessment for Johnson on October 29, 2008.  *Id.* at 637-40.  In his summary conclusions, with respect to understanding and memory, he found that Johnson's ability to remember and carry out detailed instructions was limited moderately.  *Id.* at 637.  In the sustained concentration and persistence category, Dr. Alsdurf found the following to be limited moderately: Johnson's ability to 1) carry out detailed instructions, 2) concentrate and maintain attention for extended periods, 3) perform activities on a regular schedule and be punctual within customary tolerances, 4) work in proximity with others without becoming distracted by them, and 5) complete a normal work day without interruption from psychologically based symptoms and 6) perform at a consistent pace without an unreasonable number and length of rest periods.  *Id.* at 637-38.  All other skills were not significantly limited.  *Id.* at 637.  The following social interactions were moderately limited: Johnson's ability to 1) interact appropriately with the general public, 2) accept instructions and

respond to criticism from supervisors, 3) get along with co-workers without distracting them or exhibiting behavioral extremes. *Id.* at 638. Johnson's impairments did not limit significantly any other skills in the adaptation category including travel, setting goals, and anticipating hazards. *Id.* at 637-38.

Dr. Alsdurf found that the objective data supported only partial credibility of Johnson's allegations. *Id.* at 639. Though Johnson could concentrate, understand, and execute simple instructions, he was "markedly impaired" from carrying out detailed or complex instructions or tasks. *Id.* Johnson's ability to cope and interact with co-workers and the general public was restricted significantly, but he could handle brief, infrequent, and superficial contact. *Id.* Johnson had only a reduced tolerance for responding to supervision, but could handle levels of supervision customarily found in a work setting. *Id.* Johnson could not tolerate the stress of a complex work setting, but could tolerate a three to four step work setting. *Id.*

On November 25, 2008, Christopher Geisler completed a request for medical opinion form. *Id.* at 647. He listed Johnson's diagnosis as an injury to the cervical sympathetic nerve, unspecified disorder of the autonomic nervous system, and "variants of migraines," which lasted for over thirty days. *Id.* Geisler characterized Johnson's disabling headaches and daily pain as a permanent limitation. *Id.* Johnson was not listed as having a developmental disability. *Id.* According to Geisler, Johnson was following the treatment plan but would be unable to perform employment in the foreseeable future. *Id.*

On December 17, 2008, Johnson completed a disability report asserting only tiredness as a side effect as a result of taking Lithium, Naproxen, Trazodone, and Verapamil. *Id.* at 228. He also stated that he neglected his hygiene when experiencing a headache. *Id.* at 229.

Johnson saw Geisler on December 18, 2008, for a follow-up appointment for his headaches. *Id.* at 676-77. Geisler reported that Johnson was recently switched to Verapamil from Carbatrol. *Id.* at 676. Johnson tolerated the Verapamil well and did not experience dizziness or light headedness. *Id.* Nonetheless, Johnson reported that his daily, severe headaches were constant and unchanged. *Id.* He continued to report difficulties concentrating and sleeping. *Id.* Johnson continued to take Verapamil, Naprosyn, Zantac, and Flonase. *Id.* Geisler prescribed Trazodone to help Johnson sleep. *Id.*

On December 22, 2008, Dr. Svoboda completed a § 239.2 Headaches Residual Functional Capacity Questionnaire on Johnson's behalf. *Id.* at 656-660. Based on the five visits Dr. Svoboda had with Johnson, she diagnosed him with a cervical nerve injury, Horner's Syndrome, cluster headaches, and insomnia. *Id.* at 656. She described Johnson's pain as moderate pressure pain and intermittent, sharp, and severe shooting pain that occurred approximately ten to fifteen times per day. *Id.* at 656-57. During Johnson's headaches, he experienced vertigo and could not concentrate. *Id.* at 656. Bright lights and noise triggered Johnson's headaches and worsened his head pain. *Id.* at 657. She wrote that "nothing" made Johnson's headaches better and that impaired sleep was the only objective evidence of his headaches. *Id.* at 657. Dr. Svoboda indicated that she did not think Johnson was a malingerer. *Id.* at 658.

Dr. Svoboda stated that Johnson did not tolerate Carbatrol and Verapamil did not improve Johnson's condition but rather caused him to have a mild intolerance to exercise. *Id.* at 658. At the time she completed the questionnaire, Johnson was taking Verapamil and Naproxen for his headaches. *Id.* She answered "yes" to question 20, which stated, "[d]uring times your patient had a headache, would your patient generally be precluded from performing even basic

work activities and need a break from the workplace?"  *Id.*  She also checked a box indicating that Johnson would need to take unscheduled breaks during an eight hour work day when he would need to lie down and sit quietly.  *Id.* at 659.  She expected Johnson's condition to last over twelve months.  She did, however, state that Johnson would be able to tolerate low stress jobs. *Id.*

On December 29, 2008 R. Owen Nelsen, Ph.D., L.P. affirmed all of the diagnoses in the record as a state agency consultant for mental advice on Johnson's allegations of Horner's Syndrome, cluster headaches, and shoulder problems.  *Id.* at 661-63.  After reviewing the contents of Dr. Alsdurf's October 29, 2008 Mental RFC Assessment, he fully affirmed Dr. Alsdurf's conclusion as to Johnson's impairments.  *Id.* at 662.  Dr. Nelsen noted, however, that there was no treating mental health professional contributing to the Mental RFC Assessment, yet there was no indication that Johnson's condition was worsening.  *Id.*

Dr. Gregory H. Salmi affirmed Dr. Charles T. Grant's October 25, 2008 Physical RFC Assessment.  *Id.* at 664-66.  Dr. Salmi noted no significant change in Johnson's physical condition since the October 25, 2008 assessment and that Johnson continued to suffer from Horner's Syndrome and headaches.  *Id.* at 665.

On January 5, 2009, Michael Kovar, Ph.D. served as a medical consultant in reviewing Dr. Alsdurf's psychiatric and residual functional capacity assessment.  *Id.* at 641-45, 667-70.  He agreed with all aspects and sections of both of Dr. Alsdurf's assessments.  *Id.* at 641-45, 668-69. He described Johnson as suffering from cluster headaches varying in intensity from being almost gone to requiring treatment with narcotics.  *Id.* at 667.  Dr. Kovar characterized Johnson's headaches as "erratic an unpredictable."  *Id.* at 670.  He noted that Johnson was generally able to take care of himself on a daily basis and was capable of performing "simple, work-like tasks on a

sustained basis." *Id*.  He found Johnson to have a "grossly intact concentration and memory." *Id*.  He did not consider Johnson to meet any of the listing criteria and found Dr. Alsdurf's Mental RFC Assessment "reasonable." *Id.* at 667, 670.

On February 27, 2009, Johnson saw Geisler in a follow-up appointment at the Noran Neurological Clinic.  *Id.* at 674-75.  Johnson reported that despite taking Lithium for his cluster headaches as Dr. Svoboda prescribed, his headaches remained as severe as ever and that he was experiencing pain of ten out of ten.  *Id.* at 674.  He was also experiencing extreme dry mouth as a result of taking Lithium, and thus Geisler recommended Johnson stop taking Lithium and start taking Gabapentin.  *Id.* at 675.  Johnson continued to have difficulty sleeping even though he was taking Ambien and Trazodone.  *Id*.  Johnson continued to take Simvastatin, Omeprazole, Flonase, Clotrimazole, Cephalexin, and Naprosyn.  *Id.* at 674.

On March 24, 2009, Johnson saw Dr. Svoboda and reported that Gabapentin was providing some relief from his headaches, yet he still had some pain every day.  *Id.* at 671-73.  Johnson was tolerating the Gabapentin well and Dr. Svoboda stated that she believed that Johnson could improve his pain control with higher doses of Gabapentin.  *Id.* at 671.  She recommended that Johnson reduce the dose of Naprosyn to an as needed basis based on the upset stomach side effects he experienced.  *Id.* at 671-72.  Johnson continued to take all of the other medications he was taking as of the February 27, 2009 visit.  *Id.* at 672.

On April 20, 2009, Johnson completed a SMRT Adult Physical Disability Questionnaire. *Id.* at 247-56.  Johnson listed his physical impairments as Horner's Syndrome and cluster headaches and stated that both permanent conditions began on September 11, 2007.  *Id.* at 247. He also asserted that he was unable to perform his past jobs due to seizures, blackouts, and confusion resulting from his headaches.  *Id.* at 247.  Johnson stated that he could not lift or push

any weight and if he attempted to walk or stand, then he needed to alternate sitting or standing periodically every twenty minutes to relieve pain or discomfort. *Id.* at 249.

Johnson also asserted that he could never crouch, crawl, or climb a ladder and that he experienced uncontrollable muscle movements. *Id.* at 250. He did not report any limitations in feeling or fingering, but he did have frequent difficulty handling objects as required for writing. *Id*. He required glasses to read because of near visual acuity. *Id.* at 250-51. His speech was understandable only by those who knew him, but he did not list any difficulty in listening or hearing. *Id.* at 251. Johnson avoided all exposure to extreme cold, heat, humidity and wetness and that environmental exposure to noise (sirens, yelling), vibration, fumes, odors, machinery, and heights caused his headaches. *Id.* at 252. He reported only minor limitations in most daily living activities, but he said that he was unable to drive himself to appointments, mow the lawn, care for pets, and attend weekly services and social events. *Id*. He needed help using public transportation, getting groceries, and completing household chores. *Id*. Johnson reported using oxygen for his headaches since January 2008. *Id.* at 253.

In Johnson's SMRT Applicant Questionnaire, he reported having two major seizures on February 17, 2009 and March 20, 2009, and having approximately two or more seizures per month. *Id.* at 254-55. Johnson's friend, Corey Sanders, witnessed both seizures. *Id.* at 256. Typically, Johnson was typically impaired for 10-20 minutes after a seizure and felt confused afterward. *Id.* at 254-55. He was taking 300 milligrams of Gabapentin three times per day for seizures in addition to Lithium, Verapamil, and Carbatrol. *Id*. Johnson described the following as side effects of his seizures: dizziness, light-headedness, hallucinations, dry throat, loss of memory, confusion, headaches, involuntary muscle control, suicidal thoughts, and lack of concentration. *Id.* at 255. From January 2009 to April 2009, Johnson kept track of his

headaches, seizures, and blackouts on a calendar.  *Id.* at 258-61.  He averaged approximately eight to fifteen headaches per day accompanied by severe pain.  *Id.*  In total, Johnson recorded six blackouts between February 2009 and April 2009.  *Id.*

After the administrative hearing on June 16, 2009, Johnson's Counsel provided the ALJ with an article from MayoClinic.com on cluster headaches.  *Id.* at 273-86.  Johnson's Counsel also referenced this article in a post-hearing letter to the ALJ.  *Id.* at 268-69.

### E.  Medical Expert Testimony

Dr. Andrew Murphy Steiner testified as a medical expert ("ME") at the hearing.  *Id.* at 50.  He holds a medical degree from Creighton University and has been a licensed physician since 1963.  *Id.* at 134.  Dr. Steiner is board certified in Physical Medicine and Rehabilitation. *Id.*  Dr. Steiner's review listed Johnson's impairments as follows: 1) shoulder pain as a result of the February 28, 2007 car accident and resulting surgery on the left shoulder on September 11, 2007 and on the right shoulder on January 24th[7] of 2008; 2) Horner's Syndrome leading to a drooping eye lid, inactive pupils, and a lack of sweating, which improved to a mild ptosis by March 2009; 3) cluster headaches that may be related to the Horner's Syndrome that started around the same time and improved with Gabapentin and Carbatrol; 4) hand sprain and left elbow fracture; and 5) low back and neck pain.  *Id.* at 51-52.  He further noted that Johnson described his headache pain as eight or ten out of ten.  *Id.* at 52.  Dr. Steiner did not comment on Johnson's blackouts because there was no documentation.  *Id.*  Dr. Steiner stated that none of the conditions he observed met the listing level of documentation because "it's mainly a pain case" and the other findings were "very minimal."  *Id.* at 53.  He commented that oxygen was

---

[7] The ALJ hearing transcript reflects the date as "January 34th of '08," but other evidence reflects that the date of Johnson's surgery on his right shoulder was January 24, 2008.  *Id.*

sometimes used to treat cluster headaches but rarely was effective if the patient was a smoker. *Id*.

The limitations Dr. Steiner observed primarily related to Johnson's shoulder condition. *Id*. He testified that Johnson could engage in light residual lifting and time on his feet, though he would be unable to do overhead lifting or arms outstretched lifting. *Id*. Dr. Steiner agreed with Dr. D'Amato's assessment in February 2008 that Johnson would not be able to lift over 30 pounds. *Id.* at 53-54. He explained that the discrepancy in the maximum lifting weight for Johnson between Dr. D'Amato's assessment (30 pounds) and Dr. Svoboda's assessment (5 pounds) was due to the fact that Dr. Svoboda's assessment was made much closer in time to Johnson's first shoulder surgery. *Id.* at 54. Dr. Svoboda's weight lifting recommendation was made in the Fall of 2007 after the September 11, 2007 surgery and Dr. D'Amato's recommendation was made in January 2008. *Id*.

Johnson's attorney cross-examined Dr. Steiner about the connection between Horner's Syndrome and cluster headaches. *Id.* at 55. Initially, Dr. Steiner said that Horner's Syndrome was not usually connected to cluster headaches, but after Johnson's Counsel showed Dr. Steiner a Mayo Clinic publication, Steiner said that cluster headaches and Horner's Syndrome were related to automatic or sympathetic functions; nevertheless, Horner's Syndrome was often reported without headaches. *Id.* at 56. Dr. Steiner agreed that a cluster headache is one of the most painful types of headache and can continue for more than one year. *Id.* at 57-58. A single cluster headache attack can last from fifteen minutes to up to three hours and the pain can end suddenly, leaving the patient exhausted. *Id.* at 59-60. There was not a specific disability listing that relates to cluster headaches. *Id.* at 61.

Dr. Steiner testified that Carbatrol or its generic form Carbamazepine, can cause dizziness or confusion in large doses but that these side effects should be mitigated if the doses were modulated. *Id.* at 56. Steiner testified that he believed that Johnson stopped taking Carbatrol on his own. *Id.* at 57.

### F. Vocational Expert Testimony

Wayne Onken testified as a vocational expert ("VE") at the hearing before the ALJ. *Id.* at 61. Onken holds a B.A. and an M.S. in Psychology and Vocational and Rehabilitation Counseling from St. Cloud State University. *Id.* at 133. He is a certified Rehabilitation Counselor. Mr. Onken categorized Johnson's past relevant work as a cab driver as medium to heavy (lifting up to 100 pounds) and the position of gambling cashier as medium and sedentary (lifting up to 50 pounds). *Id.* at 62.

The ALJ posed a hypothetical question to Mr. Onken about the working ability of an individual with the following characteristics: 1) age range of 47-49; 2) 13 years of schooling; 3) impairments as noted in Onken's report (Exhibit 19E); and 4) non-severe impairment from an ACL reconstruction and gastroesophageal reflux disease. *Id.* at 62-63. The ALJ then posed the following scenario regarding the hypothetical individual: 1) one report limited the individual to desk work allowing light lifting up to 20 pounds occasionally and 10 pounds frequently 2) a doctor subsequently modified the restrictions to a full range of light lifting but allowed outstretched overhead lifting tasks if the lifting was done in a mechanically correct fashion; and 3) the individual was limited to simple routine work. *Id.* at 63.

Mr. Onken responded by saying that an individual described in the hypothetical could perform jobs that would be classified as light, unskilled, and simple such as a deliverer or courier. *Id.* at 63. The ALJ then asked how restricting the individual to a sedentary level

position rather than a light position would affect Mr. Onken's testimony regarding past work. *Id*. Mr. Onken said that this sedentary restriction would preclude delivery positions as being considered a light level of work restriction. *Id*. In response to the ALJ's question about other jobs in the region that someone with the hypothetical individual's characteristics could perform, assuming the individual could work eight hours per day, Mr. Onken stated that the following sedentary unskilled level jobs would be suitable for such an individual: 1) final assembler with at least 2,000 positions in Minnesota (DOT[8] 713.687-018); 2) lens inserter with at least 1,000 positions in Minnesota (DOT 713.687-026); and 3) document preparer with approximately 500 positions in Minnesota (DOT 249.587-018) *Id.* at 63-64. In response to the ALJ's question adding an additional hypothetical characteristic, the individual's inability to follow more than simple instructions, Mr. Onken said that this additional characteristic would not change his testimony as to available jobs. *Id.* at 64.

Johnson's Counsel asked Mr. Onken how his response to the available positions question would change if the individual the ALJ described in his hypothetical would be required to take unscheduled breaks as Dr. Svoboda described in Exhibit 24F. *Id*. Onken said that in the jobs he cited as appropriate for such an individual, unscheduled breaks were "typically not tolerated." *Id*. Mr. Onken agreed with the statement that unscheduled breaks were not acceptable in a competitive full-time position. *Id.* at 65.

### G.  The ALJ's Decision

The ALJ issued an unfavorable decision on July 17, 2009. *Id.* at 10-17. In finding that Johnson was not disabled, the ALJ employed the required five-step evaluation considering: 1) whether Johnson was engaged in substantial gainful activity; 2) whether Johnson had a severe

---

[8] Dictionary of Occupational Titles.

impairment; 3) whether Johnson's impairment met or equaled an impairment met or equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1; 4) whether Johnson was capable of returning to past work; and 5) whether Johnson could do other work existing in significant numbers in the regional or national economy. *See also* 20 C.F.R. § 416.920(a)-(f).

At the first step of the evaluation, the ALJ found that Johnson had not engaged in substantial gainful activity since his alleged onset date of September 11, 2007. *Id.* at 12. At the second step, the ALJ found that Johnson had severe impairments including a cervical sympathetic nerve injury after a motor vehicle accident, Horner's Syndrome, cluster headaches, and an adjustment disorder. *Id.*

At step three, the ALJ determined that Johnson did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1525-1526, 416.925-926). *Id.* The ALJ found that Johnson had no area of functioning limited to a marked degree by his mental impairments that precluded him from meeting or equaling a mental impairment listing. *Id.*

At step four of the evaluation, the ALJ was required to consider Johnson's subjective complaints as well as objective medical evidence. *Id.* First, the ALJ found that though Johnson's medical impairments could be expected to cause his alleged symptoms, Johnson's statements regarding the persistence, intensity of the limiting effects were not credible to the extent that they were not consistent with a light work RFC. *Id.* at 14. Second, the ALJ found that the asserted severity of Johnson's impairments was consistent with neither the objective medical evidence nor Johnson's course of treatment. *Id.*

Specifically, the ALJ noted that the objective medical evidence showed that Johnson's shoulder impairment and Horner's Syndrome were improving. *Id.* at 14-15. Moreover, the

MRA findings were negative for neurological abnormalities supporting Johnson's claim of head pain of ten on a scale of ten. *Id.* at 15. Numerous doctors observed Johnson at many appointments without showing any apparent distress as a result of his headaches. *Id.* Also, Johnson decided to take a trip to Hong Kong even though he had to go without oxygen treatment for his headaches. *Id.* These facts, coupled with Johnson's decision to discontinue taking the prescribed medicines that were helping with his cluster headaches, undermined the credibility of his claims that Johnson's headaches were debilitating. *Id.*

The ALJ found that Johnson's adjustment disorder resulted in only mild or moderate functional impairments. *Id.* Significantly, Johnson did not seek mental health treatment and did not take psychotropic medications or experience decompensation.[9] *Id.* Johnson's testimony regarding his ability to carry out daily activities was inconsistent. Furthermore, no medical documentation confirmed Johnson's allegations of blackouts and memory deficits. *Id.* Rather, Johnson had good digit recall and was able to perform daily household and hygiene tasks without help. *Id.* These facts led the ALJ to conclude that Johnson was able to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) because such work was consistent with his daily functioning capacity. *Id.* Johnson was not permitted, however, to do overhead work, outstretched lifting, and was limited to simple and routine work. *Id.*

Though the ALJ noted that Johnson had a consistent record of employment, he questioned Johnson's motivation to return to the work force because Johnson did not seek any vocational services to assist with employment. *Id.*

Next, the ALJ considered the opinion evidence. *Id.* at 15-16. He placed significant weight on the opinion of the non-treating, neutral medical expert, Dr. Steiner, because his

---

[9] "Decompensation" is the appearance or exacerbation of a mental disorder due to a failure of defense mechanisms. Stedman, *supra* note 2, at 497.

physical RFC Assessment was well-supported by the record and consistent with the physical assessment of the State agency medical consultants.  *Id.*

The ALJ declined to give controlling weight to treating neurologist Dr. Svoboda's opinion that Johnson would require unscheduled breaks as a result of his cluster headaches and that such requirements would prevent him from engaging in competitive employment.  *Id.* at 16. The ALJ rejected Dr. Svoboda's conclusions about Johnson's cluster headaches because her assertions were based solely on Johnson's subjective complaints of pain; complaints the ALJ did not find credible.  *Id.*  Significantly, clinical data and laboratory diagnostic techniques did not support Dr. Svoboda's clinical findings and were inconsistent with other evidence in the record. *Id.*  The ALJ, however, did not articulate which specific portions of the record were inconsistent with Dr. Svoboda's opinion.  *Id.*

The ALJ also did not give controlling weight to the opinion of Johnson's treating orthopedic surgeon, Dr. D'Amato.  *Id.* at 16.  The ALJ noted that the weight lifting limits Dr. D'Amato placed on Johnson were assessed less than six months after his rotator cuff surgeries. *Id.*  Dr. D'Amato's records showed that Johnson was healing well after surgery and that D'Amato's opinion was not consistent with other significant record evidence regarding Johnson's RFC in the twelve month period preceding the June 2009 administrative hearing.  *Id.*

Because the evidence did not support a finding that Johnson's pain precluded him from all work activity, the ALJ declined to give controlling weight to the opinion of treating primary physician, Dr. Mastin.  *Id.*  Though the ALJ considered Dr. Mastin's opinion, it was not given controlling weight because the opinions and assessments Dr. Mastin made with respect to Johnson's ability to work were made several years prior and closely proximate to Johnson's shoulder surgeries.  *Id.*

The ALJ explicitly and specifically considered Johnson's Horner's Syndrome and cluster headaches in determining his work restrictions but found that these impairments were not severe enough to preclude the full-time performance of substantial gainful activity. *Id.* at 16. In making this determination, the ALJ gave significant weight to neutral examining source, Dr. Karayusuf, which was consistent with the opinion of the state agency medical consultants. *Id*. Dr. Karayusuf found that Johnson had only mild functional limitations with concentration, pace, and persistence and was able to engage in brief and superficial contact with coworkers and the public. Dr. Karayusuf also determined that Johnson had mild limitations in social functioning. *Id.* Thus, based on this opinion and the evidence in the record, Johnson's impairments did not restrict him from interacting with the public and coworkers. *Id.*

The ALJ cited credibility concerns and "significant inconsistencies in the record as a whole" in determining that substantial evidence did not support Johnson's assertions that he could not engage in any gainful work activity. *Id.* 16-17.

At step five, the ALJ determined that Johnson was capable of performing past work as a deliverer, which was classified as unskilled light work. *Id.* at 17. The ALJ agreed with the VE's testimony that Johnson was capable of performing unskilled light work. *Id.* Accordingly, the ALJ concluded that Johnson was not disabled from September 11, 2007 (alleged onset of Johnson's disability) up to July 17, 2009 (date of ALJ's written decision) as defined in 20 C.F.R. 404.1520(f) and 416.920(f). *Id.*

## II.      STANDARD OF REVIEW

The standards governing the award of Social Security disability benefits are congressionally mandated: "[t]he Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." *Locher v. Sullivan*, 968 F.2d

725, 727 (8th Cir. 1992).  "Disability" under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(2)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy." *Id*.

## A.  Administrative Review

If a claimant's initial application for benefits is denied, he may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may seek an ALJ's administrative review. 20 C.F.R. §§ 404.929, 416.1429.  If the claimant is dissatisfied with the ALJ's decision, then an Appeals Council review may be sought, although that review is not automatic.  20 C.F.R. §§ 404.967-.982, 416.1467.  If the request for review is denied, then the Appeals Council or ALJ's decision is final and binding upon the claimant unless the matter is appealed to a federal district court.  An appeal to a federal court of either the Appeals Council or the ALJ's decisions must occur within sixty days after notice of the Appeals Council's action. 42 U.S.C. § 405(g); 20 C.F.R. §§ 404.981, 416.1481.

## B.  Judicial Review

If "substantial evidence" supports the findings of the Commissioner, then these findings are conclusive.  42 U.S.C. § 405(g).  This Court's review of the Commissioner's final decision is deferential because the decision is reviewed "only to ensure that it is supported by 'substantial evidence in the record as a whole.'"  *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003) quoting *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002).  A court's task is limited to

reviewing "the record for legal error and to ensure that the factual findings are supported by substantial evidence." *Id.*

The "substantial evidence in the record as a whole" standard does not require a preponderance of the evidence but rather only "enough so that a reasonable mind could find it adequate to support the decision." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). Yet, this Court must "consider evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Burnside v. Apfel*, 223 F.3d 840, 843 (8th Cir. 2000). Thus, a "notable difference exists between 'substantial evidence' and 'substantial evidence on the record as a whole.'" *Wilson v. Sullivan*, 886 F.2d 172, 175 (8th Cir. 1989) (internal citation omitted).

> "Substantial evidence" is merely such "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." "Substantial evidence on the record as a whole," however, requires a more scrutinizing analysis. In the review of an administrative decision, "[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Thus, the court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory.

*Id.* (internal citation omitted).

In reviewing the ALJ's decision, this Court analyzes the following factors: 1) the ALJ's findings regarding credibility; 2) the claimant's education, background, work history and age; 3) the medical evidence provided by the claimant's treating and consulting physicians; 4) the claimant's subjective complaints of pain and description of physical activity and impairment; 5) third parties' corroboration of the claimant's physical impairment; and 6) the VE's testimony based on proper hypothetical questions that fairly set forth the claimant's impairments. *Brand v. Sec'y of the Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Reversal is not appropriate "merely because the evidence is capable of supporting the opposite conclusion." *Hensley*, 352 F.3d at 355. If substantial evidence on record as a whole

permits one to draw two inconsistent positions and one of those represents the Commissioner's findings, then the Commissioner's decision should be affirmed. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). This Court's task "is not to reweigh the evidence, and [the Court] may not reverse the Commissioner's decision merely because substantial evidence would have supported an opposite conclusion or merely because [the Court] would have decided the case differently." *Harwood v. Apfel*, 186 F.3d 1039, 1042 (8th Cir. 1999).

### C. Entitlement to Disability Benefits Under the Social Security Act

Proof of disability is the claimant's burden. 20 C.F.R. § 404.1512(a). The Administration has clarified the respective burdens of production and of persuasion for each of the five steps. 68 Fed. Reg. 51153 (Aug. 26, 2003) (stating rules are effective September 25, 2003). The claimant bears the "dual burdens of production and persuasion through step 4 of the sequential evaluation process." *Id.* at 51155. Thus, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

Here, Johnson does not dispute the findings of the ALJ with respect to the first three steps of the 20 C.F.R. § 404.1520(a)(4) analysis, rather Johnson challenges the ALJ's finding that he possessed an RFC that permitted him to perform unskilled light work in certain jobs in the national economy such as a deliverer. Admin. R. at 17. In his appeal, Johnson first argues that treating neurologist Dr. Svoboda's opinion that Johnson required unscheduled breaks was not given sufficient weight. (Pl.'s Mem. at 14-15). Second, Johnson alleges that the ALJ did not follow Social Security Administration regulations when he failed to contact Dr. Svoboda for clarification of ambiguities and conflicting information. *Id*. at 15-16; *see* 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1). Third, Johnson contends that Dr. Svoboda's opinion was not

45

given sufficient weight in determining Johnson's RFC.  Consequently, Johnson argues that the hypothetical question posed to the VE does not constitute substantial evidence on the record as a whole in determining the jobs Johnson was capable of performing given his RFC and ability to adjust to other work.

### III.      DISCUSSION

#### A.  Weight the ALJ Gave to the Treating Physician's Evidence in Determining Johnson's RFC

Johnson contends that the greater weight the ALJ gave to the non-treating, non-examining medical expert in contrast to Johnson's treating neurologist, Dr. Svoboda, caused an erroneous determination of Johnson's RFC.  (Pl.'s Mem. at 14-16).  Johnson further asserts that this failure invalidated the ALJ's determination of the jobs in the national economy he could perform.  *Id.*

In evaluating a medical opinion, an ALJ must consider the following factors:  1) the length of the treatment relationship; 2) the nature and extent of the treatment relationship; 3) the quantity of the evidence in support of the opinion; 4) the consistency of the opinion with the record as a whole; and 5) whether the treating physician is also a specialist.  20 C.F.R. § 404.1527(d).  The same factors apply to opinions of a testifying medical expert.  20 C.F.R. § 404.1527(f)(2)(iii).  A treating physician's opinion is typically entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record."  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)); 20 C.F.R. § 404.1527(d)(2).  The ALJ may credit other medical opinions over that of a treating physician when better evidence supports the opinion or when the treating physician rendered inconsistent opinions.  *Prosch*, 201 F.3d at 1013; *Holmstrom v. Massanari*, 270 F.3d 715, 720

(8th Cir. 2001).  Similarly, an ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements."  *Piepgras v. Chater*, 76 F.3d 233, 236 (8th Cir. 1996); *Thomas v. Sullivan*, 928 F.2d 255, 259 (8th Cir. 1991).  Conversely, an ALJ cannot assess a claimant's RFC by relying only on the opinions of non-treating physicians because such opinions do not constitute substantial evidence.  *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000).

Here, the ALJ explicitly found that Dr. Svoboda's opinion was not based on objective medical evidence.  Dr. Svoboda is considered a specialist under 20 C.F.R. § 404.1527(d)(5); thus ordinarily her opinion would be given controlling weight.  *See Leckenby*, 487 F.3d at 632. Though a treating specialist, Dr. Svoboda's opinion about the effect of Johnson's neurological impairments on Johnson's ability to work must be based on objective medical evidence in order to be controlling.  *Leckenby*, 487 F.3d at 632; *Prosch*, 201 F.3d at 1012-13.  As the ALJ pointed out in his decision, there were no MRA findings or any other objective medical evidence supporting Johnson's claims of pain, blackouts, and seizures.  Admin. R. at 16.

Dr. Svoboda's examination notes and disability opinion repeatedly rely on Johnson's self-reported medical history, diagnoses, and functional impairments.  An ALJ may give less weight to a physician whose opinions are based on subjective complaints rather than objective medical evidence.  *Kirby v. Astrue*, 500 F.3d 705, 709 (8th Cir. 2007).  As the ALJ recognized, Dr. Svoboda's opinion as to Johnson's need to take unscheduled breaks was conclusory and not based on any objective medical information.  Admin. R. at 16.

More significantly, Dr. Svoboda's opinions are internally inconsistent with respect to Johnson's complaints of pain and how pain affected his ability to return to his past work. *Prosch*, 201 F.3d at 1013; *Holmstrom*, 270 F.3d at 720.  For example, on April 9, 2008, Dr. Svoboda noted that it would be "impossible" for Johnson to drive as a result of his headaches.

*Id.* at 587.   Yet, on August 12, 2008, Dr. Svoboda reported that Johnson's headaches significantly improved on Carbatrol and that Johnson's headache frequency was reduced to four per day.   *Id.* at 583-84, 680-81.   Dr. Svoboda's colleague, Christopher Geisler, PA-C, contradicted Svoboda's April 2008 finding five months later on September 25, 2008, when Geisler observed that Johnson's headaches were improving and saw no reason why Johnson could not drive.  *Id.* at 580, 592, 679.   Six months later, on March 24, 2009, Dr. Svoboda stated that Johnson's headaches were improving and that Johnson was "tolerating the Gabapentin well."  *Id.* at 671.   Dr. Svoboda made this positive assessment of Johnson's headaches three months after she checked a box on Johnson's RFC Capacity Questionnaire in December 2008 indicating that Johnson would need to take unscheduled breaks throughout the day as a result of his headaches.  *Id.* at 658-59.   Thus, even though Dr. Svoboda opined that Johnson needed to take unscheduled breaks, three months later, she modified her opinion as to the debilitating nature of Johnson's headaches based on his subsequent improvement from new prescriptions. *Id.* at 658, 671.

Dr. Svoboda's assessment as to the severity of Johnson's headaches also conflicts with Johnson's primary care physician, Dr. Mastin, evaluating neurologist, Dr. Quinones, physical therapist, Wendy Ebeling, and neutral third party medical experts, Dr. Grant and Dr. Alsdurf. On April 7, 2008, Dr. Mastin questioned the debilitating nature of Johnson's headaches in light of Johnson's decision to take a trip to Hong Kong and discontinue taking Carbatrol and go without oxygen.  Specifically, Dr. Mastin observed that, "If [the patient] is really suffering from cluster headaches, [he] would be well-advised to take prophylaxis." *Id.* at 399.   On February 12, 2008, Johnson's physical therapist, Wendy Ebeling, opined that Johnson inexplicably stopped taking his pain medications.  *Id.* at 441.   On March 6, 2008, Dr. Quinones noted that Johnson's

headaches were "almost gone." *Id.* at 419. Dr. Svoboda's assertions as to the debilitating nature of Johnson's headaches were further contradicted by Dr. Grant's October 25, 2008 opinion that Johnson was capable of taking normal breaks and Dr. Alsdurf's October 29, 2008 assessment that Johnson's ability to perform tasks without an unreasonable number of rest periods was only "moderately limited" as a result of his headaches. *Id.* at 609, 616, 637-38.

The Court does not find that the ALJ lacked substantial evidence on the record as a whole based on numerous inconsistencies within Dr. Svoboda's own previous assessments and in comparison with other doctors' opinions. *Id.* at 399, 580, 587, 592, 671-73, 658-59, 679. Therefore, Dr. Svoboda's opinion did not have a sufficient objective basis to be considered a controlling treating physician opinion. *See* 20 C.F.R. § 404.1527(d)(5), *Leckenby*, 487 F.3d at 632; *Prosch*, 201 F.3d at 1012-13.

### B.   Whether the ALJ Erred in His Credibility Analysis and Determination of Johnson's Functional Capacity

In the Eighth Circuit, *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) outlines the factors governing the determination of credibility. In assessing subjective complaints of pain, an ALJ must examine several factors including: "(1) the claimant's daily activities; (2) the duration, frequency[,] and intensity of pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (citing *Polaski*, 739 F.2d at 1322). Other relevant factors are the claimant's work history and objective medical evidence. *Haggard v. Apfel*, 175 F.3d 591, 594 (8th Cir. 1999). "While these considerations must be taken into account, the ALJ's decision need not include a discussion of how every *Polaski* factor relates to the claimant's credibility." *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007) (citing *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004)). An ALJ may discount subjective complaints if

they are inconsistent with the evidence as a whole.  *Id.* (citing *Polaski*, 739 F.2d at 1322).

Because "[t]he ALJ is in the best position to determine the credibility of the testimony," this

Court defers to ALJs' decisions on credibility.  *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir.

2001).

The ALJ properly applied the *Polaski* factors to determine Johnson's subjective

complaints of pain were not credible.  739 F.2d at 1322.  With respect to the first *Polaski* factor,

Johnson's daily activities, the ALJ noted that Johnson was able to live alone, care for his

personal hygiene, prepare meals, travel independently, and complete household tasks such as

washing dishes.  *Id.* at 15.  The ALJ found that Johnson's assertions regarding the frequency,

intensity and duration of his alleged pain were not consistent with the objective medical evidence

and his course of treatment.  *Id.* at 14-15.  Specifically, the ALJ noted Johnson's decision not to

pursue the use of medication or oxygen during his 2008 trip to Hong Kong demonstrated that his

headaches were not severely debilitating.  *Id.* at 15.  Though the ALJ did not explicitly examine

the frequency of Johnson's headaches, Johnson's complaints of debilitating pain as a result of his

cluster headaches varied from experiencing head pain 24 hours per day to headaches occurring

eight to fifteen times per day.  *Id.* at 37, 656-57.  The ALJ also considered the side effects of

Johnson's headache medications, though he reasoned that Johnson's claims of adverse side

effects were "not substantiated by the most recent medical records."  *Id.* at 15.  In assessing the

final *Polaski* factor, functional restrictions as a result of Johnson's impairments, the ALJ

characterized Johnson's mental adjustment disorder as "mild to moderate."  *Id.*  Consequently,

the ALJ determined that Johnson's physical limitations as a result of his headaches and shoulder

impingement were "consistent with the ability to perform work" in congruence with a light work

RFC.  *Id.* at 15.  Despite the lack of depth of the ALJ's analysis of the *Polaski* factors, his

analysis was minimally adequate under the substantial evidence on the record as a whole standard of review. *Hensley*, 352 F.3d at 355.

The Court will not reweigh Johnson's medical evidence but rather has carefully and thoroughly reviewed the entire administrative record to determine whether substantial evidence supports the ALJ's conclusions. Such statements by Johnson's own treating physicians such as Dr. Mastin and Christopher Geisler provide sufficient support on the record as a whole for the ALJ to find that Johnson's complaints of pain were not credible. *Id*. at 399, 580, 592, 679. The ALJ was, therefore, justified in relying on the opinions of neutral third-party non-treating physicians such as Dr. Steiner and Dr. Karayusuf. *Id*. at 15-16.

### C.   Whether the ALJ Propounded a Faulty Hypothetical

Johnson also argues that the ALJ failed to include the proper RFC in the hypothetical question posed to the VE, thereby rendering that testimony incapable of serving as substantial evidence supporting a denial of benefits. (Pl's Mem. at 16-17). "It has long been the rule in this circuit that a hypothetical question posed to an ALJ must contain all of claimant's impairments that are supported by the record." *Pickney v. Chater*, 96 F.3d 294, 297 (8th Cir. 1996).

> Testimony from a vocational expert constitutes substantial evidence only when based on a properly phrased hypothetical question. When a hypothetical question does not encompass all relevant impairments, the vocational expert's testimony does not constitute substantial evidence. Thus, the ALJ's hypothetical question must include those impairments that the ALJ finds are substantially supported by the record as a whole.

*Id.* at 296.

Here, Johnson challenges only the ALJ's omission of a limitation requiring unscheduled breaks consistent with Dr. Svoboda's earliest assessment of Johnson and does not claim that the ALJ omitted any of Johnson's severe impairments. (Pl.'s Mem. at 17). Because the ALJ properly determined Johnson's RFC, the ALJ's hypothetical question was proper. The

hypothetical omitted the limitation of unscheduled breaks to be in congruence with the ALJ's justified rejection of that portion of Dr. Svoboda's opinion on grounds of inconsistency and lack of supporting objective medical evidence. *Id*. at 63. The VE's testimony in response to the ALJ's hypothetical, therefore, constituted substantial evidence on the record as a whole in support of his determination that based on the VE's opinion, Johnson possessed the RFC to perform light work and Johnson's past work as a deliverer. *Id*. at 17.

### D. Whether the ALJ Erred in Not Contacting Dr. Svoboda to Obtain Additional Information

Johnson argues that the ALJ should have re-contacted Dr. Svoboda to clear up any inconsistencies or ambiguities in her opinion. An ALJ is not required to obtain additional medical evidence if the other evidence in the record provides a sufficient basis for the ALJ's decision. *Warburton v. Apfel*, 188 F.3d 1047, 1051 (8th Cir. 1999). 20 C.F.R. § 404.1512(e)(1) states:

> We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques.

Prior to this passage, the regulation states that re-contacting is necessary "[w]hen the evidence we receive from your treating physician or psychologist or other medical source is inadequate for us to determine whether you are disabled. . . ." 20 C.F.R. § 404.1512(e). The ALJ is not required to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped. *Goff v. Barnhart,* 421 F.3d 785, 791 (8th Cir.2005). In *Goff,* the ALJ did not find the doctors' records inadequate, unclear, incomplete, or based on unacceptable clinical and laboratory techniques. *Id.* Instead, the ALJ discounted the opinions without seeking clarification because they were inconsistent with other objective evidence in the record. *Id.*

52

Similarly here, the ALJ did not discount Dr. Svoboda's opinion because it was inadequate, unclear, incomplete, or based on unacceptable clinical and laboratory techniques. Like *Goff,* the ALJ discounted Dr. Svoboda's assertion that Johnson could not sustain gainful employment because her opinion was based solely on Johnson's unverified, non-credible complaints of pain, not because of a lack of clarity or completeness. The ALJ did not need to contact Dr. Svoboda for additional information.

## IV.   RECOMMENDATION

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Plaintiff Johnson's Motion for Summary Judgment [Doc. No. 13] be **DENIED**;

2.     Defendant Commissioner Astrue's Motion for Summary Judgment [Doc. No. 20] be **GRANTED**.

Dated: July 11, 2011

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 25, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within ten days after service thereof. A judge shall make a de novo determination of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.